Good morning, ladies and gentlemen. Our first case for argument this morning is Krasno v. Mnookin. Mr. Berry. Christopher Berry May it please the Court. Good morning. My name is Christopher Berry on behalf of the Plaintiff and Appellant Madeline Krasno and we come before the Court asking to review and reverse the grant of summary judgments for the University against Ms. Krasno's First Amendment claims. The University created its official social media pages in order to communicate with the public about the University. Yet when one of its alumni did just that, criticizing the University for its animal testing program, the University responded by tracking her off-site private activity and censoring her topical commentary by manually hiding comments, temporarily restricting her accounts, and employing a words like animal testing or torture. These actions are unconstitutional viewpoint discrimination and the University justifies Well, that's true only if this is subject to the usual rules about public forums. So I think that's where we need to go. And I have a very simple question, which is why is this outpost of University thought any different from the alumni magazine? Well, Your Honor, the social media page from the University, the purpose of it is precisely a place where the University can communicate with the public and where the public can communicate. That's why I asked, why is this any different from the alumni magazine? That's the function of the alumni magazine. I just got the alumni magazine from one of my editors. They didn't claim to publish everything. So the question I'm asking is why is this way of communicating with the public on, say, a Facebook site, any different from the alumni magazine, which sometimes publishes letters to the editor but turns down some? Your Honor, it's because as the Yarnier Court recognized last year, the Ninth Circuit decision, that there is unlimited space and time that these social media platforms offer. So unlike a traditional publication or even a city council meeting, a park, where a lot of these public forum analyses are directed towards, when we're online and on social media pages, including the comment threads at issue in this case, there is unlimited space and time. And the usual concerns... That doesn't answer my question. It's a statement of fact. It's, of course, false. Nothing is unlimited, right? There may be more space. Nothing is infinite, except maybe the universe. But it doesn't answer the legal question, why there is a difference. Your answer to my first question obviously agrees that the university, as the publisher of the alumni magazine, can choose what's in it, right? And could have, for all I know, does have a no-Krasno policy for letters to its alumni magazine. I can't see why, as a legal matter, this is different. That's my problem. Your Honor, an important distinction to make here is between the posts and the comment thread beneath the post. So on each page, the university... You're just telling me something about facts. I'm asking about law. Well, the law recognizes the distinction between government speech, where the state itself is making the speech, which would be the post... No, not where the state is making the speech. That's why I asked about letters to the editor. The letters to the editor of the alumni magazine are the speech of the letter writers. But the university, as publisher, as editor, chooses what will be there. And here we have this website where the university, as publisher or editor, claims a right to choose what will be there. That's why I'm asking a legal question about why there would be any constitutional difference between the two. And again, Your Honor, I think that goes back to the point, whereas in the alum magazine, there is limited space, and there, in order to have... Why is that a constitutional question? The constitutional... The reason that that's constitutionally relevant... Let me put it this way. If you ask whether a public park is a public forum, the answer is yes, although there's limited space, right? You can't have an infinite number of people saying an infinite number of things at the same time. But it's a public forum, notwithstanding the fact that there is limited space and time. You don't want to say that about the alumni magazine, right? Okay, I see we're not getting very far on this question. You mentioned the Ninth Circuit's position in O'Connor-Ratcliffe or Garnier. I'm puzzled that you have not noticed, the adversary appears not to have noticed, that the Supreme Court has granted certiorari in that case. What are we to make of that fact? Well, Your Honor, even setting aside the presidential value of the Ninth Circuit analysis, the Ninth Circuit analysis in that case is... I'm not asking about the Ninth Circuit analysis. I'm asking about what we are to make of the fact that the Supreme Court has granted certiorari. I think that's immaterial because this case, putting aside even that analysis entirely, the record here shows, in fact, that the purpose of the social media pages is to allow and foster expressive activity. There's nothing in the record at all that there is any sort of practical or material limitation on that. What does that have to do with my question? The significance of the grant of certiorari, or the significance of the fact that the Sixth Circuit expressly disagreed with the Ninth Circuit, and the Supreme Court granted certiorari in that case too, or the fact that the Supreme Court has asked for the Solicitor General's views in the net choice cases, in which I think the grant is likely next week. We've got a field where the Supreme Court is active, and I'm trying to figure out what our role is as an inferior court, given the fact that this is on the Supreme Court's docket. That's the burden of my question. What should we do? Certainly, it indicates that the Supreme Court is interested in this, that this is an issue of social media comments, social media pages, and interaction. Do you think we should wait until the Supreme Court rules before we delve into your case? Your Honor, you know, that's a prudential question, and I'm not clear exactly what the Supreme Court has granted writ on, what question in particular it's asked there, I know, in the net choice. I'm just shocked that you're relying on a Ninth Circuit case, and you haven't even noticed a grant of certiorari. Why haven't you read the petition? Why haven't you read the briefs? It's very easy to know what the Supreme Court is considering. Regardless, go ahead, Your Honor. All right. If we were to agree with you that the social media sites are non-public forums, what would this mean? In other words, is it your position that there could be no regulation at all, or what regulation of content do you think would be permissible? Well, Your Honor, in analyzing this as a designated forum, the university in this case, in a case where the government generally does have the ability to impose restrictions and limits on a forum that it creates, and that could include an off-topic limitation. However, it would have to be properly implemented according to the First Amendment case law, which means that there needs to actually be a policy or regulation, which doesn't exist here. The university doesn't actually prohibit off-topic comments through a social media statement. It only says that moderators may remove them if they're undeveloped policy that the university is here, and it needs to be implemented in a way that's non-discriminatory. What do you think the university would have to do or say on its social media sites to limit comments enough to make them qualify as non-public forums? Your Honor, the university would need to essentially provide reasonably clear and definite notice about what its restrictions are, and to consistently apply those in an even-handed way. None of those factors are present here, but for example, if a policy said that all comments must be on-topic, and then to be clear about what that means, is it on-topic with regards to the purpose of the page, which as the record shows in this case, is about the university generally, or is it with regards to being on-topic for the post, and how is that determined? How far would you take that? Many legislatures will receive comments from the public, and many legislative hearings do. They're designed for the public to talk to the legislature. And yet, anything that's off-topic will be ruled out of order. Does the President of the Senate need to publish a set of regulations before ruling out of order any comment that doesn't appear germane? Certainly this can be and should be limited within reason. In this case, the university's policy is unreasonably unclear. The President of the Senate doesn't have any public policy, any at all. The Senate follows Robert's Rules of Order, which says that non-germane comments may be excluded. Period. That's all it says. Is that constitutionally deficient in your view? I'm not familiar with the Robert's Rules or how they're implemented. I just told you what they say. Non-germane comments may be excluded. Period. That's it. An important part of the inquiry also is the way that it's enforced, and there's no even-handed or just enforced. Do you think somebody who wanted to say something in a Senate committee, but was prevented on grounds of germaneness, could file a lawsuit to ask the federal judiciary to tell the Senate what comments it had to listen to? Your Honor, again, it goes back to fact and circumstance dependent inquiry. I've told you what the rule is. Non-germane comments may be excluded. Nothing else. You were making the argument that there has to be something like a code of federal regulations, detailed definitions, rules of procedure, and so on. That's not how legislative bodies that receive public comments work. I'm asking whether, in your view, that's all unconstitutional. Your Honor, I think this ties back, actually, to the point about the alum magazine, which is you can't publish every letter to the editor, and you can't let every person, perhaps, at a Senate committee meeting or a city council meeting, give comments about anything they want to, because there are time and space limitations that would, in fact, be very disruptive. The government's limitation of that, so that other people can speak and that people don't have to be at a city council meeting for 48 hours before it adjourns, is a very reasonable limitation. That's simply not present in the online context, and I think that is an extremely important factor that demands a different outcome in this case than in the hypotheticals that are being presented. Well, has the Supreme Court ever said anything like that? Well, what the Supreme Court has said is that we need to look to the— Has the Supreme Court ever said anything like that? We need to look at the nature of the form. The answer is yes or no, and then you can tell me if it has, where it has, and if it hasn't, you can explain the significance. But I wish you'd address my question. I don't know offhand that the Supreme Court has addressed that in these exact situations, but we do have a guiding principle— Or any situation. Any situation. At all. Has the Supreme Court ever said that as a constitutional matter, what determines the constitutionality of exclusion is whether something is unlimited? Has it ever said that? Not in those words, but what the Supreme Court has told us— Or in any similar words. What the Supreme Court has told us is that we must consider the nature of the form, whether it's compatible with the type of activity here, and that goes— If we agree with that, with your definition, that the First Amendment can be restricted based on the form, looking at the case in front of us, if we were to proceed before the Supreme Court rules on the Ninth Circuit case or the Sixth Circuit case, is your contention that the comments section, the interactive comments section, is a designated public forum? Yes, Your Honor, and— And tell me why. It's a designated public forum because, well, there are two factors we need to consider. First, whether it's compatible with expressive activity. Both Facebook and Instagram say the purpose is for expression. The district court found that was easily met, and in fact, looking to the purpose of the university and having these pages, it is to foster communication between the public and the university. And additionally, look to the purpose and the practice. And the purpose and the practice—excuse me, the policy and the practice of the university in attempting to limit the social media forum is inadequate because the restrictions are undeveloped. The social media statement simply says moderators may remove comments that are off-topic. It doesn't explain how it's determined. So the argument that I'm hearing this morning is that because the University of Wisconsin-Madison has not defined the parameters of how people can interact or use the interactive comments section, that qualifies it as a designated public forum and not a non-public forum? Your Honor, that is a part of the inquiry, or that is certainly a part of the analysis. It also doesn't—the policy or the statement from the university says nothing about using keyword filters. And I think that this gets to an elephant in the room, both with regards to this questioning and the district court analysis, which is the viewpoint discrimination. The way that this has been implemented is uneven-handed. I'm sorry, counsel. Judge Rovner was commenting. Excuse me. Yes, Your Honor. Suppose a university used the keyword filter, but the commenter would get an automatic notice about her comment, that it had been hidden, and a message about how to appeal. Would that change your analysis of the constitutionality of the keyword filter? No, Your Honor, for two reasons. And that's because both the RAV case and the Lambs Chapel case from the Supreme Court require a finding of viewpoint discrimination here. In the RAV analysis, Justice Scalia wrote a quote that I think is extremely relevant here, which is that the state may not license one side of a debate to fight freestyle while requiring the other to follow the marquee of Queensberry rules. And what I mean by that is that these keyword filters target, and the university has admitted, the record shows, that this is intended to target anti-animal testing speech. Anyone commenting about animal testing, to have their comment be automatically removed based on some prior determination that the comment must be off-topic is simply improper. And as an example of that, So the contention that the keyword filters is on its face viewpoint discrimination, regardless of the forum? Yes, particularly the way that it's used here. For example, in a comment where the university said, that says science is awesome, and then talks about a cool science image contest, my client responded saying that your science involves research on non-consenting animals, and then had to spell out animal testing, A space, N space, L space, M space, A space, and so forth, because she was aware of the filter. Had she not done that, and the comment had been automatically removed, the university's post about science, of which she was criticizing the university for its science, would have been automatically removed, whereas anyone saying science at any cost is great, or touting maybe the results of some research that the university had done, that relied on animal testing, that relied on cruel animal testing, would not have been removed. And that sort of categorical exclusion of viewpoints is exactly the situation in Lamb's Chapel, where essentially a categorical limitation on a type of speech, in this case animal testing speech, would be automatically restricted, regardless of whether it was responsive to a permissive topic or not. I think the error in your argument is starting with Lamb's Chapel and not Cornelius, and clearly defining the forum and the forum's intent, and dealing with the social media statement, when it was put in place, what guidelines or restrictions were put in place for how the comment interactive section of the social media pages were to be utilized, because that's the launch point for the court being able to assess whether or not this was viewpoint neutral or not. And was this content neutral? If we don't start there, we can't answer the other questions. We did start our analysis with viewpoint discrimination, and that's because viewpoint discrimination is unconstitutional, regardless of the forum. But it goes right back to Judge Easterbrook's statement. Can you yell out in the middle of a Senate hearing, irrespective of the topic that's being dealt with on the floor? No, and that, again, is because of time and space restrictions. I would note, for example, I think a good analogy— Then I'd like you to come back to the alumni magazine. Correct.  So is it your position that in the web version of the alumni magazine, every letter to the editor must be published, unedited? Well, because it is a traditional curated publication, that creates additional restrictions. I would— No, there's no space restriction in the internet version. The University of Wisconsin will not run out of electrons. It would require additional time in order to curate that, and the government has no obligation— My point of your position was that it could not be curated. Whatever was submitted has to be published. Well, in fact, if there were a comment thread, if there were comments allowed in response to that, my answer would be yes. I'm not asking about comments yet. I'm just asking about letters to the editor. There's an online version. The number of electrons in the universe is very large. Must the University of Wisconsin publish, in the online version of its alumni magazine, every letter submitted unedited? No, because that is government speech, whereas in the comment threads, this is an area where people can talk independently. I just don't understand the difference. The letters to the editor are not government speech, but the government is the editor. It requires a placement. A letter to the editor, for example, requires somebody at the university to proactively— Cut and paste. Cut and paste, and that's not present here. What I would suggest to the court as an analogy is that, unlike shouting something or ranting about an off-topic thing at a Senate committee meeting, that a comment that someone posts independently on their own, that's their own speech in a comment thread, underneath the university's post is no different than the scales of justice that I have on my tie clip right here, which is that you may notice it and ask me questions about it, or you may think about it, or your eyes might just go right over it the way someone can scroll past a comment in a social media comment thread. The amount of disruption caused by even an off-topic comment, which we certainly— Yes, I think we have your position, counsel. Judge Rovner, any further questions? No, thank you very much. Okay. Thank you, Mr. Berry. Thank you very much. Mr. Kilpatrick. I would like you to begin with roughly where I began with Mr. Berry, which is, what should we do given the fact that the Supreme Court has granted review in two similar cases and may very well next week grant review in two more? Yes, Your Honor. In the Garnier case, I believe that the question presented is whether school board officials engage in state action by blocking members of the public, and that, I believe, is a different legal issue than is here. Here, the university did not argue that the means of moderating by the defendants was not state action. I do understand, though, that in Garnier, the Ninth Circuit Court of Appeals determined that— No, we're not interested in what the Ninth Circuit said, nor in what the Sixth Circuit said in the case that conflicts with it. I'm trying to figure out what we should do in our role as an inferior court given the grant of certiorari, given the grants of certiorari. Your Honor, given that I believe that the issues are different, state action is not present here, I believe the court can continue. Have you read the briefs? No, Your Honor, I have not. What the parties are arguing about is about the significance of the fact that some public official who's participating on a website like Facebook is not doing anything different from what any member of the public can do on his or her own Facebook site. Facebook makes certain tools available. The parties argue that Facebook is itself private territory, and they say when a public official uses the same tools that a private person uses, there's no extra constitutional overlay. Now, the technical legal question may be different, but those are important arguments in a case like this. So how should we respond? Then the university would not be opposed to this court waiting and taking its time to make its decision on whether to affirm, which we ask, until after the decision of the Supreme Court takes place. But again, Your Honor, it's our position that this court can and should affirm the decision of the district court. Before the Supreme Court rules? No, if the court chooses to wait, then the university is not opposed for the court to wait. Mr. Kilpatrick, what is the current state of the filters? Do they contain the same set of words as they did during the relevant times of the alleged injury? No, Your Honor. Obviously, this is not in the evidentiary record, but I did check with my client, and I've been told that the keyword filter has not been used since April of this year. That was the last time it's been used. There are no words in the filter. It's not turned on, and that's a key point that the university has made, is that the keyword filter is used only when necessary. I'm sorry. Before you said that, I was going to ask you if you can go home now because it's all moot, but I guess not. Well, again, I think the point of the keyword filter is that it is used on an as-needed basis. The university uses it only when it believes that it sees what it calls a spam campaign. Is this a new modification? No, no. So the keyword feature always turned on and turned off after a post? No. The evidence shows that the university's policy is that it uses the keyword filter when it sees that there is going to be a spam campaign, and it defines that itself by a deluge of off-topic comments that are coming in. How can the university know before it creates a post whether or not the blocked words on the keyword filter will be off-topic? What happens is that if it sees comments coming in to, for instance, animal rights advocacy, there are no posts on the page related to animal rights advocacy, and it gets back. So what happens is that the university would take words that it sees from these comments coming in, had it put them into the filter, turned on the filter, and then that blocks off-topic comments, hundreds, from coming in and disrupting the posts that are not related to the comments coming in. So that, I want to make clear. I thought my understanding from the record is that the university represented that it could do that, but at the time of the lawsuit it was not implementing that type of policy as far as the keyword filter. Well, the keyword filter comes on and comes off depending on spam campaigns, and the evidence showed that, yes, there were spam campaigns, and the university— And does the evidence show that the keyword filter was not turned on before the post? Well, I guess the question is what post you're talking about, Your Honor, because— Let's use the September 2020 Dairy Cow post. Okay. Was the keyword filter on or off? When that came on, it may have been on. It may have been on when that post was made, but again, that is something that took place far in the past. As I said, now the policy is that it turns on when a spam campaign is about or is taking place, and it turns off thereafter. And what was the timing of that policy change? Well, it's always been in place, Your Honor. Whether there are specific times and how long the keyword filter is on and off, that is not in the record. Mr. Kilpatrick, you know, your brief says that social media managers may remove comments based on one criteria, whether they are unrelated to the topic or purpose of the page. But they can also remove obscene comments even if they are related, right? Yeah. And also comments about Trump and Biden, presumably even if they are relevant. So, for example, my comment would be hidden if I said, congratulations to Linda Greenfield, a University of Wisconsin alum and current Political Science Board of Visitors member, for being nominated by President Biden to be ambassador to the U.N., wouldn't it? It would depend on the post, Your Honor. And that's my point here. I think that's the example of the post. I just gave you the example. I'm sorry. I'm sorry. The post was congratulations. Right. And then your comment was? It mentions President Biden. Okay. So, if there were a keyword filter. Is it that one? Never mind. If there were a keyword filter in place at the time, then yes. But there's no evidence that there's such a keyword filter in place all the time with regard to Biden and Trump. The point here of the keyword filter is that it is not used all the time. It is not on all the time, unlike some other cases that were discussed. This is turned on and off. And, again, I say represent to the court that it hasn't been used since April. Let me drill down just a little bit on Judge Rovner's point. How does the university decide whether a topic or whether a comment is on topic or off topic? What's the guidance given to the social media manager? Using her post, Judge Rovner's example, what's the guidance? Yes, the social media statement takes the large view that it maintains the right to remove off-topic comments. Then there's an interim guidance that is directed to the social media managers at UW-Madison, and they are to evaluate the stated purpose for which the page or post exists in the context of comments, the subject, topic, or purpose of the initial post to which the comment is attached. So there is this link between the subject matter of the post and the subject matter of the comment. Ms. Krasno would like to say that there is no link. She wants to be able to comment. No, she doesn't want viewpoint discrimination. Right, but she wants to comment about her views on animal rights advocacy. And she wants to do that to a post, for example, that the university makes congratulating the women's volleyball team on its national championship. And in a non-public forum, the university has considerable selectivity in determining what is germane. But even in a non-public forum, the university is not permitted to engage in viewpoint discrimination. That's correct. So irrespective of the forum, viewpoint discrimination is not permitted. Going back to Judge Rovner's example, the social media manager that has just posted about President Biden nominating a University of Wisconsin alumni, what is the guidance given to the social media manager as to now that people are going to begin commenting, potentially about President Biden, potentially about the nominee? What's the guidance that is given to the social media manager? Again, one from the social media statement. It can't be off-topic. A little more guidance. How is this not different from the Mansky case where the Supreme Court said the word political in polling places, too broad, too much discretion. You've got to go down and put some guardrails around it. That's where we're trying to—I'm just trying to get clarity on that. And how are we able to distinguish it? Well, here, again, I believe that the thread, the link between the post and the comment, needs to be the subject matter, the topic of the thread of the post to the comment. And, again, the social media managers are told to evaluate the stated purpose for which the page or the post exists in the context of the comments, the subject, topic, or purpose of the initial post. And so with that, there is guidance given to the social media managers. But do they have to be subject matter experts to determine whether or not it's on or off-topic? No, they don't have to be subject matter experts. Obviously, there is some use of common sense here. And also, there is the ability of social media managers, when there are gray areas, to contact Office of Legal Counsel. But there are certainly exhibits, examples of social media managers that will hide off-topic comments. And that is—those are stated in the brief. Does the record—I'm sorry, Judge Rovner, go ahead. Just a minute, please. Does the record reveal anywhere that the university has targeted off-topic comments unrelated to animal testing? I'm not sure what you mean by targeted. There's examples of removal from the post, comments that are not related. In the keyword filter? In the keyword filter, no. Again, and that's because the university sees a spam campaign, and the evidence shows that a majority, a vast majority, of those spam campaigns are run by animal rights advocates. And so it makes sense, then, if the university is to use the keyword filter, it would see the words in the comments that are being used, part of the spam campaign, to put those in. I am skeptical about this claim that the university would turn off the filters if comments about animal testing ever became relevant. For example, let me give you an example, please. If the university posted about a new deal in which Nike would be supplying the basketball team with brand-new leather basketball shoes. So let's say Ms. Krasno might want to comment something like, Nike could provide vacant leather shoes that would perform just as well and avoid animal deaths. Do you think this would be on topic? That's my first question, and my second is, how would the university know when a comment about animal rights might be relevant? Well, again, Your Honor, there's discretion given to the social media managers. If the social media managers are unsure, if it's a gray area, they'll contact the Office of Legal Affairs, and likely it would be in the abundance of caution, likely it would remain there. But there are certain… Wait, what would remain there? It's likely, I can't tell you yes or no whether that comment is on topic or not. What I'm saying is that social media managers would contact legal affairs, and the legal affairs could say, well, leave that comment on in the abundance of caution. Wait a minute, you are legal affairs, I take it? Well, I'm sorry, I meant in-house counsel legal affairs. I see. So is that anywhere in the policy that they are to reach out and not make that decision on their own, that they are to reach out to legal counsel? Yes, I believe that's in the interim guidance. It certainly was in our brief, Your Honor. And so my point is this, is that the district court was correct in finding that this was a non-public forum. The university desires discussion on the topic of its posts. The appellant, on the other hand, views the social media pages differently. She sees them as her own personal soapbox that she can make comments and replies to posts about anything related to the university. For this reason, her comments about her views against animal testing that is taking place at the university is too broad. The university does a lot of things. The university has an observatory. Does that mean that in response to a post, again, by the university congratulating the women's volleyball team, simply because it has a university, Ms. Krasna would be able to comment or anyone comment about aliens, UFOs, because the university has an observatory? That's what she says is that animal testing on all of the posts are related to the university because the university performs invasive primate research. Mr. Kilpatrick, if the university put a notice on its social media pages that said anyone who comments about animal testing before they can, let's see, anyone who comments about animal testing will be banned from this site, would that be a prior restraint on speech? That would be a viewpoint discrimination, likely prior restraint, and that's not what has been happening here. Can you distinguish that comment from a filter that prevents most comments about animal testing before they can be seen? I mean, why isn't it a prior restraint? Just help us with that. Because what that assumes is that it assumes that Ms. Krasna has the ability to issue a comment about animal rights advocacy to a post that is not germane. Again, there is no... I don't understand this whole line of reasoning. Why don't you just give up? This is obviously subject matter jurisdiction, subject matter discrimination, and it's probably many other kinds of discrimination. But I thought the main argument is the university is entitled to do just that, right? The university surely thinks it can do that in the alumni magazine, that it can have a no-Krasno policy, right? Why are you trying to defend this case on the weakest conceivable ground? Because there is no intent to discriminate against Ms. Krasna or her colleagues in the animal... That's a question of fact. What you want to do is win this case on the law. But if you choose not to argue the law, you guarantee yourself a loss. Well, I believe we've been arguing the law with regard to what type of a forum is this, and it's our contention that the district court was... Is your standing to contest the keyword filters? Pardon me? Is your standing to even contest the keyword filters? Not. There is no standing to contest the keyword filters as they are not being used to block views of animal rights advocacy altogether. Again, what matters is that the comment be related and germane to the post. And the keyword filter is used to counter spam campaigns, in which there's this deluge of comments, usually all the same, and vast majority from animal rights advocates that contain these words. And so the keyword filter is used. But if Ms. Krasna has no right to make off-topic comments in the first instance, then she has no standing because there's not going to be any harm. There's no threat of injury to her because she has no right in the first instance to make comments on to off-topic. I am lost. She has no standing because she loses on the merits? That's not a normal standing argument. No, Your Honor, it's because... What you said is she has no standing because she has no rights. And that's just backward. Well, again, the decision of the district court was first to determine what is the forum. And we believe that it's right that the forum is non-public. And the non-public forum allows the university to have an off-topic rule. If the comment is off-topic, it works. Well, it enforces the off-topic rule, Your Honor. All right. Thank you very much, counsel. Thank you, Your Honor. The case is taken under advisement.